Good morning everyone. I'm very pleased to be sitting today with Judge Clifton and Chief Judge Rice from the Eastern District of Washington, who's sitting by designation. We really appreciate Chief Judge Rice's help and appreciate his joining us, and we thank you all for doing this by telephone. It was not possible to schedule this argument during our regular sitting last week, so thank you everyone for joining us by phone. We will take up the cases in the order in which they appear on the calendar. The first is Harutyunyan v. Sessions, 13-71606. Each slide will have ten minutes. May I begin, Your Honor? Yes, thank you. Thank you, and good morning. Good morning, judges. My name is Satsu Nalbandian on behalf of the petitioners, and I would like to reserve, and I will mention in two minutes for rebuttal, basically at this point with regard to Ms. Harutyunyan's case, I would like to address the inconsistencies first, the alleged inconsistencies, and I believe the one that the IG made the biggest deal out of was whether it was 20 times or 50 times that Ms. Harutyunyan's son, Edward, was beaten. However, the BIA in its first decision correctly summarized it as being 20 to 50 times, and Edward was sitting in the courtroom, and he could have easily parroted what his mother said. If we read the testimony, we see the IG interjecting almost every other question. This IG has a tendency to do that, and interjecting on every other question, and basically whether it was 20 times or 50 times, I believe, in this case, is not germane to the claim he was beaten many times, obviously, and Ms. Harutyunyan kept stating that, I did not count, I did not count, and then when pressed, she came up with an estimate. So that's one inconsistency that the IG gave. The second inconsistency, which is very common in all Soviet countries with regard to the work documents stating that she resigned, whereas she was actually fired from work, and she indicated that this was common practice in those countries, and I'm not at liberty to testify with my knowledge, but, however, her testimony was not accepted by the IG. Did she present any evidence, like country conditions evidence, that supported her characterization of this being common? She did not, Your Honor, and the only thing I can think of is possibly an expert could have indicated that because I have looked it up myself, and there is no documentation that says that was the common practice. However, if her testimony is deemed credible, then we have to accept that as being basically true in the record. Did the IJ ever ask for documentation? No, she did not. With regard to whether or not that was the common practice, the IJ did not ask for documentation. To the best of my recollection and reading of the transcript, Your Honor. Thank you. Thank you. And also with regard to I believe there were no other significant inconsistencies mentioned. With regard to the birth certificate, respondent and her son were shocked that it was found to be not credible, I mean not authentic, and under Yemen Burhi they had no knowledge of the authenticity of the birth certificate being inaccurate or inauthentic. They provided affidavits, DNA records, child photos, school records, medical records. So there was ample documentation of the identity as alternatives, and assuming the facts of the case to be true, I would just ask Your Honors, since it is part of the record, to take a look at the first BIA decision. I know it's not controlling, I mean obviously I know it's not here or there, but I think the BIA summarized it perfectly in that case, that assuming to be credible there is a nexus in the case with regard to the beatings happening as a result of the mother's intervention in the ballot stuffing. It's consistent with country reports for opposition members being targeted, and it is also the fact that he was never beaten previously and the beating started subsequent to her intervention, and the person who beat them at the school actually specifically stated in their threats that your mother should know who she's dealing with and so forth. So there is ample circumstantial evidence as to the motive of the beaters under Canales, Vargas, and Ninth Circuit case law. There is circumstantial evidence and direct evidence as to the motives of the persecutors, and also under Canales, Vargas, threats and harm to family members is sufficient to establish well-founded fear of future persecution as to the lead petitioner. This is Judge Clifton. Are you asserting a case for past persecution? As to Edward Haruchunyan, I am, Your Honor. What authority would you cite to suggest that schoolyard beating constitutes harm that rises to the level of persecution, which is supposed to be a severe concept? I would, in this case, Your Honor, I would distinguish it from cases where it's generalized harm or a schoolyard beating. In this case, it's specifically targeted for his imputed political opinion. Well, that mixes questions. That might make out a case for nexus, but it doesn't say anything about the level of harm, and I haven't seen anything that suggests the level of harm imposed here, although unfortunate, rises to the level of persecution. What would you point to as an authority that would suggest that this kind of harm amounts to past persecution? I would argue, Your Honor, that it's clearly given his age and the frequency of the beating and the fact that he had kidney problems as a result of beating. I would argue that it is offensive and certainly shocks the conscience to have an individual that age being beaten repeatedly 20 to 50 times. Don't take her word for it, because he didn't say that, did he? He did say it was at least 20. He did say it was about 20 times. Not 50? No, not 50, Your Honor. Okay. And what I asked you for was a case authority. Do you have any precedent that supports your proposition? As to what precedent? Well, Your Honor, there is the Mashiri case. There is the Guo, which Guo distinguishes what is persecution and what is not. And also there is the Cora Blina case, which states that cumulative harm may be sufficient under Sankha versus INS as well, where a single isolated incident may not rise to persecution, but cumulative effect of several incidents may constitute persecution. And I would argue that this cumulative effect of the 20 beatings and the threats and the kidney problems would suffice the persecution, Your Honor. So thank you for your question. Do we have any evidence with regard to the severity of the kidney problems? We have the letter indicating that he did have the kidney problems, but the severity, I believe, was not discussed therein. However, again, I would argue that kidney problems is already, in and of itself, severe, Your Honor. Did the BIA discuss whether the injuries and beatings were enough to constitute persecution? I believe they did not, Your Honor. I believe they addressed only the credibility, and I'm trying to pull up the BIA decision at this point. But from my recollection, they did not. Would you like to reserve your remaining time? You have a little more than two minutes left. Oh, thank you, Your Honor. Yes, please. Thank you very much. Great. Good morning, Your Honors. My name is Michael Hays. I'm the past respondent with the Attorney General of the United States. We have several issues here in this case that, when taken individually, might lead to a different result. But the totality of the circumstances and digging deeper into each of them, when considering them all together, soundly established that substantial evidence supports the agency's decision to deny relief and protection here based on their lack of credibility and their failure to corroborate. I didn't hear any arguments about corroboration. I'm assuming you might be discussing that on call. And focusing on the credibility issues, there's three critical inconsistencies and three main implausibilities. First, as Your Honors were discussing, the 20 versus 50 number regarding the number of meetings. That's a 250% difference between the two of them. And actually, in their opening brief, petitioners concede that this is an inconsistency and attempt to explain it away as a concerned mother. And while that's certainly understandable, that does not change the fact that they bear the burden of proof here as the individual seeking relief and protection from removal. This is Judge Clifton. By either version, this kid is being beaten up lots of times. I'm not sure how much difference that really makes or how surprised we should be that a mother views this with horror and might, in her own mind, think it happened more often than it really did. Exactly, Your Honor. And that's the one perspective if the court looks at the beating and standing alone. The point here is that, or at least the distinction here, is that the agency, the board, and the immigration judge are looking at all of these facts in totality. All of these pieces, when molded together, show that the case unravels if each of these pieces is taken out. But doesn't the IJ need to ask whether there was an explanation for the reported inconsistency? So you can't really add them together cumulatively unless each of them is following its own. And here, this one, it seems like the IJ never asked them to explain. Maybe if they had had a chance to really explain, the mother would have said I'm counting every time he was hit, and the kid was only counting every time he was bruised or something. This is a sort of obvious error that really doesn't require any further explanation. They can try to explain it after the fact. The simple fact is they're not anywhere near on the same page. This court in Soto Hall. But it doesn't seem that obvious. I think there are reasons why you might count differently, depending on how you're defining a beating. That's entirely possible. What's important, though, is that, again, stepping back and looking at the broader perspective, is we have a discussion of apparently the first two beatings. We have a little bit of detail as to what happened with those. But then after that, it simply drops off. We don't know where they happened, what happened, the treatment that he required for them. He's claiming to have suffered any damage, difficulty urinating, things like that. We have a statement from a neighbor that says she provided medical treatment, but, again, not today. So looking at all of these things together, there's simply not enough to confirm exactly what happened and ultimately whether or not these things happened at all. Again, putting all of this together, you have a huge difference in the number of beatings. But on top of that, there's the fraudulent birth certificate. Now, they're saying, well, we're shocked we didn't know this was a fraudulent birth certificate because nonetheless they've never admitted that it is, in fact, fraudulent. Well, what are they supposed to do if they believe it's not? I mean, isn't there a chance that someone gave them a fraudulent birth certificate, given that there actually is DNA evidence that he's the son? I mean, it's kind of a weird thing to say. Again, looking at the totality of all of these pieces, certainly that's a possibility if that was the only basis for the adverse credibility finding, but we have a lot more to do. Well, as Judge Quint said, does the fraudulent birth certificate really matter in the larger scheme of things? Is there any serious doubt that Edward is their son? As far as I can tell, you know, I'm not sure what DNA tests can prove or can't in terms of a relationship. Obviously, if they prove a relation, I don't know if it proves it's her son or if they're just related. What we have, however, is that it's not. In your answering brief, have you argued that she is not his mother? To put this into context, what I'm getting to is that even if the birth certificate were fraudulent, it would seem to matter whether or not that actually advances the case. If the issue in question is not contested, then I'm not sure the submission of a fraudulent birth certificate, whether it was knowing or unknowing, can be said to have been presented in order to advance a case they couldn't have made otherwise. So, I'm sure you're concerned about the fraudulent nature, but I'm not sure how significant the birth certificate was. In this court, it looks like issues regarding, especially discrepancies regarding identity are key in determining the son eligibility. That was Eric.  Because in your brief, I don't really see an argument that he's not who he claims to be. It's not necessarily that he's not who he claims to be. It's how they attempted to go about it. Do you have any evidence that they knew this document wasn't real? Real is not the standard, Your Honor. There's a difference between adverse credibility and asylum fraud. The latter involves much more difficult and substantial consequences. Adverse credibility is simply a finding that the court, or excuse me, the agency, doesn't know what to believe. It's not necessarily that they're lying. It's just that they haven't provided enough evidence that they're lying. But doesn't the Gaimani-Bearhey case say that it matters whether they knew that the document was real? Again, looking at the totality of all of these circumstances, this is one factor among many. For a particular fraudulent document, standing alone, yes, knowledge is probably going to matter. But this one, in this broader context of at least six critical issues that the agency pointed out, as well as a failure to corroborate, ultimately contributes to the entire finding. Again, we have her claiming that she was fired, whereas the document she provided says that she quit voluntarily. As Your Honor asked, is there any evidence of her explanation that this is somehow common? Public counsel has conceded, no, there is no evidence of the record, and that they couldn't find anything after the fact, and that perhaps an expert could testify to that. But this is all speculation. All of these things together, again, it all gets back to who bears the burden of proof. These are individuals seeking relief from removal and removal protection. And taking all of these items together, it simply doesn't add up. And on that point, turning to the implausibilities, five is only she targeted when there were 20 other individuals present for the Celebs Battlefront. What about Mr. Gregorian as some kind of nationally influential individual that can essentially find more evidence than you want? Can I just ask about the 20 other individuals? Isn't the story that she's the one who interfered personally, though? I'm not sure. There weren't really actions by the other 20, were there? There weren't any actions ultimately by her other than stopping him after the fact. Why is he continuing to target her, as she claims, if she didn't do anything about it? She never went to the police about it. She didn't report it beyond that. There were no consequences that can be after that. On top of that, she could have asked any one of those individuals for a statement of some kind as to him, as to who he was, why this mattered. This individual that they're claiming has ruined their lives was their neighbor. They could have asked any one of their neighbors for something. They were able to get statements from individuals that did help them. None of them said anything about this guy being some kind of massive individual that can control their lives anywhere in Armenia. And, again, they bear the burden of proving that they can't go anywhere. Did you actually tell them they needed to document his role in the community? There was a certain amount of public discussion. I believe your attorney was talking about the opportunity to explain or being given the notice of the opportunity to corroborate. That is stemming from Brynn and subsequently this court in Bagrai talking about how if an individual is corroborating or expected to corroborate otherwise credible testimony, that, however, does not apply in cases where the individual lacks credibility, unless the court decides that the adverse credibility itself is not supported by confidential evidence. Then that comes in. I think you made reference to, excuse me, Judge Clifton again, the possibility of relocating and the way that Mr. Durian's influence spread across the country. Looking at the BIA's decision, did it go beyond the adverse credibility finding? The board discussed credibility and corroboration. It did not get into the alternative findings regarding past persecution or the well-founded fear of persecution. The immigration judge did reach those findings. He made a whole host of those findings. Can we reach them? No. If the court believes that the adverse credibility finding is not supported by substantial evidence and finds that the corroboration requirements were unreasonably expected, or on top of that if an act of notice was given to corroborate, then the court must remand for the agency to address these in the first instance. I see that my time is up. If the court has any further questions, I'll gladly answer them. Thank you, counsel. There are two and a half minutes left for rebuttal. Thank you, Your Honor. With regard to the question of whether or not the harm amounts to past persecution, I would like to address well-founded fear of future persecution as well in the alternative, Your Honors. In this case, the family did suffer incidents of harm, even if it does not rise to the level of past persecution given the country reports, which are replete and ongoing with regard to what is going on in Armenia regarding political opponents and people who oppose government corruption being targeted and persecuted. It is not unreasonable, certainly ten percent chance at least, for the person who has been singled out for threats of persecution to suffer that harm. What evidence is there that there's really reason to fear this one individual, because it appears to be only one individual who was offended, as an arm that's so long reached anywhere in the country? Your Honor, actually there is no evidence as to this specific individual. However, there is evidence that, for example, the country report discusses Montel Gregorian, who is also another powerful figure in Armenia, and how his reach is basically how his individuals target opponents, and not just in the city of Etchmiadze, but throughout Armenia. Well, telling me that somebody else has that reach really doesn't help your client, does it? Because that's not the person that's out to get your client by your client's story. It sounds like you've acknowledged there isn't any evidence that the person who your client offended many years ago has a reach that can reach all over the country. Well, the individual, according to the client's testimony, Your Honor, is a member of the Republican Party, is a supporter of Kocharian, the president, and basically his brother is a policeman, and his father was the head of the criminal department in the administrative record states. That's so, even though the country report does not specifically mention this individual, the fact that Armenia targets opponents and individuals who expose corruption, in which case, in this case, she prevented ballot stuffing, which is common during the elections, is sufficient to establish that you don't need to have it mentioned in the country reports or third-party news articles, because not every high-ranking oligarch in Armenia is mentioned in every news article. I understand Your Honor's concern, but I think the testimony and the country reports coupled together should suffice. And I'm not sure if I have any time left, but I'm willing to answer any questions Your Honor has. Otherwise, I would just rest at this point. Thank you, both sides, for the helpful argument. Thank you, Your Honor.
judges: Clifton, Friedland, Rice